# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ERVIN CARTER**                                                      **CIVIL ACTION**

**VERSUS**                                                              **NO. 19-11219**

**DARREL VANNOY**                                            **SECTION: "E"(3)**

## REPORT AND RECOMMENDATION

Petitioner, Ervin Carter, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On August 29, 2014, petitioner was convicted of eight counts of armed robbery using a firearm under Louisiana law.[1] For each count, he then received a concurrent sentence of one hundred four years (ninety-nine years for armed robbery[2] and an additional five years for using a firearm[3]) to be served without benefit of parole, probation, or suspension of sentence.[4] On July 29, 2015, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[5]

---

[1] State Rec., Vol. 9 of 10, transcript of August 29, 2014, pp. 12-13; State Rec., Vol. 2 of 10, minute entry dated August 29, 2014; State Rec., Vol. 2 of 10, jury verdict forms.

[2] See La. Rev. Stat. Ann. § 14:64(B) ("Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence.").

[3] See La. Rev. Stat. Ann. § 14:64.3(A) ("When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.").

[4] State v. Carter, No. 1304695, 2014 WL 7387314 (La. Dist. Ct. Sept. 12, 2014); State Rec., Vol. 9 of 10, transcript of September 12, 2014.

[5] State v. Carter, 171 So. 3d 1265 (La. App. 5th Cir. 2015); State Rec., Vol. 2 of 10.

The Louisiana Supreme Court thereafter denied his related writ application on October 17, 2016,[6] and he did not file a petition for writ of certiorari with the United States Supreme Court.[7]

On or after January 11, 2018, petitioner filed an application for post-conviction relief with the state district court.[8] That application was denied on March 1, 2018.[9] His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on May 30, 2018,[10] and the Louisiana Supreme Court on May 6, 2019.[11]

On May 14, 2019, petitioner filed the instant federal application seeking habeas corpus relief.[12] The state filed a response arguing that the application should be dismissed as untimely.[13] The state is correct.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[14] With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

---

[6] State v. Carter, 207 So. 3d 1068 (La. 2016); State Rec., Vol. 10 of 10.
[7] See Rec. Doc. 8, p. 3, Answer to Question 9(h).
[8] State Rec., Vol. 2 of 10.
[9] State Rec., Vol. 3 of 10, Order dated March 1, 2018.
[10] Carter v. Vannoy, No. 18-KH-167 (La. App. 5th Cir. May 30, 2018); State Rec., Vol. 3 of 10.
[11] Carter v. Vannoy, 269 So. 3d 695 (La. 2019); State Rec., Vol. 10 of 10.
[12] Rec. Doc. 8.
[13] Rec. Doc. 19.
[14] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, those alternative provisions are not applicable in the instant case.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on October 17, 2016. Therefore, his state criminal judgment became final for AEDPA purposes on **January 17, 2017**, upon the expiration of his ninety-day period for filing a petition for a writ of certiorari with the United States Supreme Court.[15] As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

After three hundred fifty-eight (358) days elapsed, petitioner tolled his federal limitations period in the instant case by filing a post-conviction application with the state district court on January 11, 2018.[16] Although that application was denied by the district court, it nevertheless

---

[15] See United States Supreme Court Rule 13(1) ("Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort … is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment."). Here, the ninetieth day of that period fell on a Sunday, and the following day was a federal legal holiday. See 5 U.S.C. § 6103(a) ("The following are legal public holidays: … Birthday of Martin Luther King, Jr., the third Monday in January. …"). Therefore, petitioner's deadline was extended until Tuesday, January 17, 2017. See United States Supreme Court Rule 30(1) ("In the computation of any period of time prescribed or allowed by these Rules, by order of the Court, or by an applicable statute, the day of the act, event, or default from which the designated period begins to run is not included. The last day of the period shall be included, unless it is a Saturday, Sunday, federal legal holiday listed in 5 U.S.C. § 6103, or day on which the Court building is closed by order of the Court or the Chief Justice, in which event the period shall extend until the end of the next day that is not a Saturday, Sunday, federal legal holiday, or day on which the Court building is closed.").

[16] Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record in this instance, the Court has simply used the signature date of the application as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed. See

remained "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings, so long as petitioner continued to seek review at the higher levels of the state court system in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, the state courts did not find petitioner's related writ applications to be untimely. Therefore, the Court will assume that tolling continued uninterrupted until the Louisiana Supreme Court denied post-conviction relief on May 6, 2019.[17]

Once the limitations period then resumed running at that point, petitioner had only seven (7) days remaining. Accordingly, he had only until **May 13, 2019**, either to again toll the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before May 13, 2019. Therefore, he clearly is not entitled to further statutory tolling.

The Court must next consider equitable tolling. Petitioner argues that equitable tolling is warranted in his case because he did not receive timely notice of the Louisiana Supreme Court's decision of May 6, 2019. In support of that argument, he alleges:

> Petitioner had six days left to file this petition, however, the Louisiana
> Supreme Court no longer mails the rulings to prisoners through the postal service,

---

United States v. Minor, 582 F. App'x 315, 316 (5th Cir. 2014); Estes v. Boutté, Civ. Action No. 19-2289, 2020 WL 1990823, at *2 (E.D. La. Mar. 6, 2020), adopted, 2020 WL 1984331 (E.D. La. Apr. 27, 2020); Crochet v. Goodwin, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); Thornton v. Terrell, Civ. Action No. 09-1631, 2009 WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009).

The only state applications petitioner filed prior to his post-conviction application were ones which merely concerned requests for documents or access to records. See State Rec., Vol. 2 of 10. However, those applications cannot be considered applications "for State post-conviction or other collateral review" for tolling purposes because they were preliminary in nature and did not directly call into question the validity of his convictions or sentences. Higginbotham v. Tanner, Civ. Action No. 10-1130, 2011 WL 3268128, at *1 (E.D. La. July 29, 2011); Parker v. Cain, Civ. Action No. 02-0250, 2002 WL 922383, at *2 n.22 (E.D. La. May 1, 2002), certificate of appealability denied, No. 03-30107 (5th Cir. June 23, 2003); Boyd v. Ward, Civ. Action No. 01-493, 2001 WL 533221, at *4 (E.D. La. May 15, 2001), certificate of appealability denied, No. 01-30651 (5th Cir. Aug. 22, 2001).

[17] Tolling ended when the Louisiana Supreme Court denied of post-conviction relief, because a petitioner receives no additional tolling credit for the period during which he could have sought further collateral review by the United States Supreme Court. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

they now Email them to the Prison's Legal Programs Department. The Legal Programs Department Logs them in their records for whatever prisoners have received mail from the Supreme Court and several other State courts which do E-Notices, and eventually they are distributed to the prisoner.

In this instance, the judgment is dated May 6, 2019, however, the envelope which contains the judgment is stamped May, 13, 2019, this envelope was not tendered to petitioner until today, May, 14, 2019. This constitutes "cause" by operation of state actors that the judgment was not timely tendered to petitioner so he could timely get this pleading and the Memorandum of Law in Support to this Honorable Clerk of Court's Office.[18]

However, although the AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases," Holland v. Florida, 560 U.S. 631, 645 (2010), it is nonetheless "unavailable in most cases," Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) (emphasis added). Specifically, "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted). Regarding the two prongs of the Holland test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight. Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements"). And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other. See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, supra, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

---

[18] Rec. Doc. 8, p. 17.

<u>Menominee Indian Tribe of Wisconsin v. United States</u>, 136 S. Ct. 750, 756 (2016).[19]  Moreover, the burden of proof to establish entitlement to equitable tolling is always borne by the petitioner. <u>Alexander v. Cockrell</u>, 294 F.3d 626, 629 (5th Cir. 2002).

This Court acknowledges that *prolonged* delays in a petitioner receiving notice of a court ruling can in some instances qualify as an "extraordinary circumstance" for equitable tolling purposes.  <u>See, e.g.</u>, <u>Hardy v. Quarterman</u>, 577 F.3d 596, 598 (5th Cir. 2009) ("*Long* delays in receiving notice of state court action may warrant equitable tolling." (emphasis added)); Brian R. Means, Federal Habeas Manual § 9A:112 (2020) ("A *lengthy* delay between the issuance of a necessary order and an inmate's receipt of it might provide a basis for equitable tolling." (emphasis added)).  However, the delay in petitioner's receipt of the Louisiana Supreme Court's electronic notice of its judgment was only approximately one week – a period of time roughly comparable to the delays experienced when judgments are sent by regular mail (given the time it takes for such mail to be processed and delivered to the prison by the United States Postal Service, coupled with the additional time it then takes for prison staff to then process, sort, and deliver the mail to the inmates).  Therefore, the brief delay here can hardly be considered an "extraordinary circumstance."

Furthermore, *even if* the Court were inclined to consider the delay an "extraordinary circumstance," that would still be only *half* of petitioner's battle.  As noted, to be entitled to equitable tolling, he must *also* establish that he pursued his rights *diligently*, because "[e]quity is

---

[19] <u>Menominee Indian Tribe</u> was not a habeas corpus case.  However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of <u>Holland</u>; therefore, the reasoning therein is applicable to habeas cases.  <u>See, e.g.</u>, Brian R. Means, Federal Habeas Manual § 9A:83 (2020).

not intended for those who sleep on their rights." <u>Mathis v. Thaler</u>, 616 F.3d 461, 474 (5th Cir. 2010) (quotation marks omitted).  Petitioner has not made that showing.

It is true that a petitioner need not show that he exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is *reasonable* diligence." <u>Holland</u>, 560 U.S. at 563 (emphasis added; quotation marks omitted).  However, for the following reasons, the Court finds that petitioner did not meet even that lesser standard.

The United States Fifth Circuit Court of Appeals has held that, in order to be eligible for equitable tolling, "a petitioner must show that he pursued the habeas corpus relief process with diligence and alacrity *both before and after* receiving notification." <u>Hardy</u>, 577 F.3d at 598 (emphasis added; quotation marks and brackets omitted).  While petitioner undeniably acted quickly to file his federal application *after* receiving notice of the Louisiana Supreme Court's ruling, he clearly did *not* act with diligence and alacrity *before* that time.  On the contrary, although his state criminal judgment became final for AEDPA purposes on January 17, 2017, petitioner fails to put forth any reason for the *three hundred fifty-eight (358) days* he waited to seek post-conviction relief in the state courts.  In other words, *he allowed almost his entire one-year federal limitations period to elapse before he even began seeking such relief in the state courts*.  In this Circuit, such delays in seeking post-conviction relief are considered indicative of a lack of diligence.  <u>See, e.g.,</u> <u>Schmitt v. Zeller</u>, 354 F. App'x 950, 951-52 (5th Cir. 2009) ("[Petitioner] delayed approximately ten months after his conviction was final before applying for state habeas relief. ... [Petitioner]'s filing the state petition after squandering most of the year available under Section 2244 is a factor in deciding whether equitable tolling should be allowed for problems that arise in later filing the federal petition.  Leaving little margin for error is incautious and not

diligent."); <u>Green v. Cain</u>, Civ. Action No. 14-0654, 2018 WL 1442899, at *6 (M.D. La. Feb. 27,
2018) ("[Petitioner] failed to proceed with reasonable alacrity so as to preserve his right to pursue
federal habeas corpus relief in light of the procedural posture of the state court proceedings.  In
this regard, by allowing 355 days of un-tolled time to elapse from the one-year limitations period
before even commencing his PCR proceedings, Petitioner created a situation whereby he had only
ten days left within which to maintain the continued pendency of his state court post-conviction
proceedings through three levels of state review and to then file a timely federal habeas corpus
application. … The long delay noted above weighs heavily against a finding of equitable tolling
in this case."), <u>adopted</u>, 2018 WL 1440210 (M.D. La. Mar. 22, 2018); <u>Davis v. Cain</u>, Civ. Action
No. 14-cv-2364, 2017 WL 4296401, at *4 (W.D. La. Aug. 8, 2017) ("Petitioner put himself in a
dangerous position by waiting until day 351 to file his post-conviction application and toll the
federal limitations period. … By doing so, he left himself with only 14 days to file in federal court
after the state process ended.  That is not diligence."), <u>adopted</u>, 2017 WL 4294104 (W.D. La. Sept.
26, 2017), <u>aff'd</u>, 762 F. App'x 208 (5th Cir. 2019).

The Court notes that the facts of the instant case are remarkably similar to those in <u>Ott v.
Johnson</u>, 192 F.3d 510 (5th Cir. 1999).  In that case, by the time that Ott filed his state post-
conviction application, all but one day of his federal limitations period had expired.  Moreover,
because the state court notified him of its decision denying post-conviction relief by mail, and
because that mail took two days to reach him, the one day remaining on his federal filing deadline
expired before the mail reached him.  He therefore argued that "it would be inequitable to apply
the limitations period because he mailed his federal habeas petition for filing on the first business
day after receiving notice of the denial of the state application" and that the state had "created an

impediment to the timely filing of his petition by its notification of habeas denials through mailed postcards." Id. at 514. The United States Fifth Circuit Court of Appeals rejected that argument, noting that the onus had been on Ott to take the precautions necessary to preserve his federal eligibility:

> [W]e underscore that the state habeas application was not filed until one day before the expiration of the AEDPA's one-year grace period, an action that necessarily mandated a swift filing of the federal habeas application following the denial of the state petition. This was a matter totally within the control of Ott. The state application readily could have been filed a few days earlier, allowing an adequate period for the filing of the federal petition after final denial of the state application. Accordingly, we find that these are not "rare and exceptional" circumstances in which equitable tolling is warranted.

Id.

The same logic applies in the instant case. The delay in petitioner's receipt of the Louisiana Supreme Court's judgment was both minimal and foreseeable, and he was imprudent to allow almost his entire federal limitations period to expire before beginning the state post-conviction process. Equitable tolling simply is not intended to serve as a catch-all safety net for prisoners, such as petitioner, who fail to take reasonable precautions to protect their ability to seek federal relief. See Schmitt v. Zeller, 354 F. App'x 950, 951 (5th Cir. 2009) ("We have recognized that a component of the obligation to pursue rights diligently is not to wait until near a deadline to make a filing, then seek equitable tolling when something goes awry.").[20]

---

[20] The Court further notes that petitioner also failed to take another precaution available to him: filing a "protective" petition in federal court and asking that the federal habeas proceedings be stayed until his state remedies were exhausted. See Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005). Although the United States Fifth Circuit Court of Appeals has "decline[d] to hold that the failure to file a protective petition *alone* prevents a prisoner from receiving equitable tolling," it has nevertheless noted that the "failure to file a protective federal habeas petition *weighs against*, but is not dispositive of, the reasonable diligence inquiry." Palacios v. Stephens, 723 F.3d 600, 608 (5th Cir. 2013) (emphasis added).

Accordingly, for all of these reasons, the Court finds that petitioner has failed to establish that equitable tolling is warranted in this case.

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
>
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

In the instant case, petitioner has not invoked Perkins. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that he has not made the showing required under Perkins for the following reasons.

In assessing a claim of actual innocence, a court normally first examines the evidence presented at trial and on which the petitioner's conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x

474 (5th Cir. 2016); <u>Lyles v. Tanner</u>, Civ. Action No. 13-655, 2014 WL 4674673, at \*6 (E.D. La. Sept. 17, 2014).

In the instant case, petitioner was charged with armed robbery, which is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. Rev. Stat. Ann. § 14:64. On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the prosecution's evidence of petitioner's guilt of that crime as follows:

> The State presented evidence at trial to show that defendant committed the following four armed robberies in Jefferson Parish: (1) Advance Auto Parts at 7150 Westbank Expressway on July 28, 2012 (count one – Ron Carpenter; count two – Ferdinand Francis);[FN 2] (2) Advance Auto Parts at 2414 Belle Chasse Highway on August 9, 2012 (count three – Raymond Reimann; count four – Tina Nickleson); (3) Radio Shack[FN 3] at 5257 Veterans on June 19, 2013 (count five – India Sever; count six – Eric Hernandez), and; (4) Radio Shack at 1200 Clearview on June 24, 2013 (count seven – Ciarrion Matthews; count eight – Lamberto Parulan, Jr.). The State also presented evidence that defendant committed another armed robbery at a Radio Shack in Mobile, Alabama, on May 22, 2013.

> > [FN 2] The State correctly notes in its brief that defendant, in his brief, erroneously listed the victims' names in the eight different counts based on the original and second amendment to the bill of information. The State further notes that when it amended the bill the third time, the names of the victims were rearranged into different counts. As such, in this opinion, the eight different armed robbery counts and their respective victims reflect what is shown in the State's superseding bill (the third amendment).

> > [FN 3] It is noted that "Shack" is spelled "Shak" throughout the transcripts of the proceedings. For the purposes of this opinion, the correct spelling "Shack" will be used.

> ### Advance Auto Parts/July 28, 2012
> Detective Brandon Veal testified that on July 28, 2012, he was employed by the Jefferson Parish Sheriff's Office in the Patrol 3rd District. On that date, he responded to an armed robbery call at an Advance Auto Parts on the Westbank Expressway. There were two victims on the scene, Ron Carpenter and Ferdinand Francis.[FN 4] Detective Veal interviewed them and learned that $2,082.00 was taken from the store.

[FN 4]  In his brief, defendant refers to Ferdinand Francis as "count seven," and Ron Carpenter as "count 8."

Ferdinand Francis testified that he was employed by Advance Auto on July 28, 2012, and on that night he worked with his supervisor, Ron Carpenter. After 8:30 p.m., two individuals entered the store and one of them asked Francis to show him a radar detector. After going back to the counter, the man reached behind his back and pulled out a chrome revolver and told Francis that "this was a robbery." Neither one of the two men wore masks. Francis lay on the floor while Carpenter opened the safe. The second man did not appear to have a firearm, and he never spoke at all to Francis. After robbing the safe, the man directed Francis to open the register at which time the money was taken out of it. Francis and Carpenter were ordered to go to the back of the store. The store had taken video surveillance of the robbery, which was shown to the jury. Francis said that after the robbery he was shown a police lineup, from which he identified a suspect.

Ron Carpenter testified that on July 28, 2012, he worked at Advanced [sic] Auto Parts in Marrero, with Ferdinand Francis. Carpenter's testimony was consistent with that of Francis regarding the details of the robbery. Carpenter recalled that the man who asked about the radar detectors was the same man who pulled the gun and asked to have the register opened. The gunman was a light skinned black male, approximately six foot two inches tall and 240 pounds. Carpenter explained to the gunman where all the money in the store was kept. After handing all of the money in the store over, the "dark-skinned black male" asked Carpenter and Francis for their cell phones and the gunman told them to walk to the back of the store. The two employees stayed in the back of the store for approximately 10 to 15 minutes before Carpenter walked back to the front of the store, retrieved his cell phone and called 911. He met with officers when they arrived. Approximately one year after the robbery, Detective Cedric Gray showed Carpenter two photographic lineups, and he identified one suspect out of the second lineup.

Detective Cedric Gray testified that he had been employed by the Jefferson Parish Sheriff's Office and was assigned to the Robbery Section on July 28, 2012, the date the Advanced [sic] Auto Parts was robbed. Following the robbery, Detective Gray met with Carpenter and Francis, and obtained surveillance video from the store's regional manager. There were no leads in the case for several months, until Detective Gray's commander showed him two photographs that reportedly identified suspects in the Advanced [sic] Auto Parts robbery. Detective Gray compared the photographs to the video from July 28, 2012, and saw resemblances between the two men in the photos and the video. Detective Gray then compiled a lineup, which included the two men shown in the photographs, and showed these to Carpenter and Francis. Francis made an identification of defendant as the person who had robbed him and Carpenter, in the second lineup that was presented to him by Detective Gray. Similarly, when Carpenter was shown the

second photo lineup, he identified defendant as the man who had drawn the gun and robbed him and Francis.

### Advance Auto Parts/August 9, 2012

Officer Jace Pellegrin testified that he worked for the Gretna Police Department on August 9, 2012, when he responded to an armed robbery call at an Advanced [sic] Auto Parts at 2414 Belle Chasse Highway. When he arrived at the store he learned that the two employee victims were "Tina" and "Raymond". Officer Pellegrin noted that within the store there was an empty cash till on a counter near the register, an open safe in the back of the store, and phone lines inside of the store that had been cut. Officer Pellegrin interviewed the two employees and crime scene photographs were taken. Eventually Detective Richard Russ took over the investigation from Officer Pellegrin.

Tina Nickleson testified that on August 9, 2012, she worked an evening shift at Advanced [sic] Auto Parts in Gretna with Raymond Reimann. Prior to the shift on that date, her store had been made aware of an armed robbery that had taken place at an Advanced [sic] Auto Parts in Marrero, and photos of the suspects in that robbery had been transmitted to her store. That evening, her store was robbed by a "lightskinned male" with a gun who had asked to purchase steering fluid. A second darker-skinned male, who had been standing in the back of the store, came over and stood over Nickleson while the other robber took Reimann to open the store's safe; however, the safe had a ten-minute time delay. The robbers took the night deposit from Reimann, and walked to the back of the store where they told him to kneel down. Nickleson and Reimann were told by the robbers to stay on the floor for ten minutes, otherwise they would be shot. When the two men exited the store, Nickleson used her phone to call 9-1-1.

Nickleson said that she was not shown a photographic lineup of the robbers until almost a year after the robbery. However, at some point she saw an article online that contained the photos of two men, who she recognized as the robbers of her store. After being shown a photographic lineup by police, she identified defendant as the robber who had held the gun. Video surveillance of the robbery of Nickleson's store was shown to her at trial, and she narrated the events. She testified that she had an unobstructed view of the gunman's face.

Raymond Reimann testified that he was an employee of Advanced [sic] Auto Parts on August 9, 2012. His description of the details of the robbery corroborated those in Nickelson's [sic] testimony. Reimann identified defendant in court as the man who asked to purchase the power steering fluid. Approximately one year after the robbery, Reimann was shown a photographic lineup. Prior to that, however, Nickelson [sic] sent him an article about two people who robbed stores in Jefferson Parish. From the two pictures attached to that article, Reimann recognized one of the men as the gunman in the robbery of his store. Again, Reimann identified defendant in court as the gunman. When shown a first photographic lineup by police, Reimann was unable to identify an individual with 100% certainty, although one person in the lineup looked familiar. In the second

lineup shown to him by Detective Russ, Reimann identified the gunman with 100% certainty. Reimann identified the defendant in court as the gunman. In court, Reimann also identified defendant from the surveillance tapes recorded on the day of the robbery of his store.

Detective Richard Russ testified that on August 9, 2012, he was working in the Gretna Police Department's Criminal Investigations Division. On that date he investigated an armed robbery at an Advanced [sic] Auto Parts store on Belle Chasse Highway. He interviewed two victims on the scene, Tina Nickleson and Raymond Reimann, and took statements from them. While no suspects were immediately identified, in July of 2013 Detective Russ was contacted by Detective Paul Smith, with the Jefferson Parish Sheriff's Office Robbery Division, and advised that two individuals, Woodrow Martin and Ervin Carter, were believed to be connected to the Advanced [sic] Auto Parts robberies. Detective Russ constructed photographic lineups of the two suspects and later showed them to the two victims. Raymond Reimann identified defendant as the gunman in the robbery in the second photographic lineup that Detective Russ presented to him. Similarly, Tina Nickleson identified defendant from one of the photographic lineups and Woodrow Martin in the other photo lineup.

### Radio Shack/June 19, 2013

Eric Hernandez testified that he was employed by Radio Shack[FN 5] on June 19, 2013, and worked with India Sever in the store on that date. Hernandez testified that near closing time he was taking the trash out to a dumpster behind the building, when a man with a gun jumped out from behind a trash can and forced him back inside the store. A second man was with the gunman. Hernandez had never seen the gunman before, but described him as an African American of medium height, approximately six feet tall. The two robbers checked to see if the store was clear of customers, and then one of the robbers went into the front of the store to "grab Miss Indi." Hernandez and the first gunman were in the area where the high priced merchandise was kept in the store, known as "the cage." The two robbers brought mesh bags from their car and began to fill the bags with items from the store. At that point, India was back in the cage with Hernandez, while the two robbers continued filling up the mesh bags. India and Hernandez had both been restrained with "zip lock ties" with their hands behind their backs. The robbers took money from the cash register drawer and exited the store. Hernandez untied his "zip ties" and India's hand ties, checked that the robbers were gone and that the doors were locked and then called 9-1-1.

[FN 5] The record shows that the Radio Shack was located on Veterans Boulevard in Metairie, within Jefferson Parish.

After the police arrived, Hernandez was shown a photographic lineup, but he was not able to identify anyone. He was then shown a second photographic

lineup of suspects, and he identified a single individual as the person who followed the first gunman into the store.

India Sever testified that she worked the late shift at the Radio Shack store on Veterans Boulevard on June 19, 2013, with Eric Hernandez. Near closing time, Sever was at a desk near the front of the store while Hernandez took out the store's trash. She was checking her phone for messages and, when she looked up, a man was holding a gun in front of her face. He demanded that she empty the cash register, which she did, placing the money inside of a plastic Radio Shack bag. The gunman then walked Sever back toward the cage, where she saw mesh bags full of cell phones and other electronics. The gunman told India to put "Beats"[FN 6] headphones in the bag, and asked if there were any other computer laptops. Sever and Hernandez were then instructed to lie face down on the floor, and their hands were zip tied. The robbers exited through the back door, and Sever and Hernandez waited for approximately 15 minutes before freeing themselves from the zip ties and checking to see that no one else was in the store. Following that, they called 9-1-1 and their district manager. When shown a photographic lineup, Sever did not recognize any of the individuals depicted in the photos.

       [FN 6] "Beats" is a popular name brand headphone.

Detective Wayne Rumore testified that he worked in the Robbery Section of the Jefferson Parish Sheriff's Office, and was the lead investigator of an armed robbery that took place on June 19, 2013. Detective Rumore interviewed the victims, India Sever and Eric Hernandez. He verified that several items were stolen from the Radio Shack, including cell phones which had IMEI numbers that could be tracked when activated. Detective Rumore notified the cell service providers and gave them the numbers of the stolen phones. Neither Sever nor Hernandez could identify a suspect from the photo lineup shown to them on the evening of the robbery. Items tested for DNA from the crime scene either were related to Sever, or did not have enough material to test.

With respect to the Radio Shack on Veterans, Woodrow Martin, who assisted defendant in the robbery, explained that he and defendant gained entry through the back door when an employee came outside to take out the trash. Martin stated that he was armed during the robbery. He testified that during that robbery, he went to the front, locked the door, came back to the female at the register with a pistol in his hand, told her to open the register and empty it, and then told her to walk to the back where the high-end merchandise was kept. Martin further testified that they put merchandise in laundry sacks and tied up the victims using zip ties. He and defendant were worried about security footage so they took the recording device at Radio Shack.

**Radio Shack/June 24, 2013**[FN 7]

Lamberto Parulan, Jr., testified that on June 24, 2013, he worked for Radio Shack on Clearview with Ciarrion Matthews during the "closing shift." That night,

at approximately 8:30 p.m., Parulan saw Matthews on the camera monitor walking toward the back of the store where he was working. Parulan said that before he could exit the back room, a gunman appeared from behind Matthews, stuck a gun in his face and asked him to turn around. After he complied, Parulan was zip tied. Matthews was told to open up the cage where the "high-end merchandise" was kept and then she, too, was zip tied. The gunman then opened the back door to the store and let another man in. A lot of merchandise was taken from the cage. Parulan was shown a photographic lineup, from which he identified defendant as the robber who had held the gun.

> [FN 7]  Defendant refers to these two victims in his brief as count five, Ciarrion Matthews, and count six, Lamberto Parulan.

Ciarrion Matthews testified that she worked the closing shift at Radio Shack located at 1200 Clearview on June 24, 2013, with Lamberto Parulan. On that night, she was cleaning the store, when an African American man came in and asked for an iPad mini. Matthews went to the back room or "cage" to retrieve one, while the man followed her. Matthews asked the man to wait outside the back room for her, but he followed her in and pulled a gun on her and Parulan, then told them to get on the floor. Parulan was zip tied first, with his arms behind his back and face down toward the floor. She and Parulan were still on the floor when the gunman let a second robber in through the back entrance. The second robber's attempt to get Matthews to open the register failed when he saw a customer in the store, and he directed Matthews to go the back of the store. The two men began putting the merchandise from the cage, such as phones, tablets and headphones, into "laundry bags." The robbers told Matthews and Parulan not to move as they left through the back door. Matthews and Parulan waited until they were sure the robbers were gone before going back to the front of the store and calling 9-1-1 from Parulan's cell phone.

Matthews identified defendant as the individual she believed to be the first gunman and the person who came in and asked for the iPad mini.

Woodrow Martin testified that he and defendant robbed a Radio Shack on Clearview.

### *Additional Testimony*

Detective Smith testified that on July 9, 2013, he assisted Baton Rouge Police and U.S. Marshalls [sic] in locating defendant in Baton Rouge. Also, he met with Detective Steve Hill of the East Baton Rouge Sheriff's Office, and they were able to author a search warrant for defendant's house at 16819 Bonum Avenue in Baton Rouge. Detective Smith executed that search warrant at defendant's house. Once inside, they seized numerous items including cameras, a video recorder, an iPad, cell phone boxes, cell phones, ammunition (.40 caliber, .9 mm, and .223 caliber), a Chase money bag, a Regions Bank bag, two-way radios, batteries, wires, a gun (Caltech Model P11, .9 mm), a gun case, an extra magazine, a BB gun, a

16

"Beats" mobile speaker, and a safe. Detective Smith could not say for certain whether those items were stolen; however, some of them matched the description of items taken from the Radio Shack robberies.

Detective Smith also testified that during the execution of the search warrant defendant's black Toyota Tundra truck was parked in his carport. Inside that truck, they located a red bag containing a Radio Shack bag, a receipt from Radio Shack for batteries from Knoxville, Tennessee, binoculars, four black mesh bags, zip ties, a hat, black knitted bags, black gloves, and a firearm containing a magazine with a bullet in the chamber. A black bag was also found next to the red bag in the truck. Inside that black bag were flashlights, eight knives, brass knuckles, pliers, a holster for a gun, a black permanent marker, a razor pointer, a black Taser in a case, a black taped-down baton, a "blackjack," and two "window punches" used to break windows.

Afterward, Detective Smith went to the residence of co-defendant, Woodrow Martin, and his girlfriend, Nora Brooks. The police were there because they learned that Martin had given his vehicle to defendant. At some point that day, detectives realized Martin was the second suspect in the robberies. Brooks signed a consent to search form for her residence at 13764 Kenner Avenue in Baton Rouge. During the execution of the search warrant, the U.S. Marshalls [sic] located a firearm containing a magazine in an Impala belonging to Martin. During the search of the residence they located "Beats" headphones and a speaker, and contents of a safe – a black ski mask, a Wells Fargo money bag, and paperwork. A cell phone was seized from Martin because it had the same IMEI number of a cell phone that was stolen in the Mobile robbery. Martin was placed under arrest, advised of his rights, and gave a statement. Defendant was eventually apprehended on July 10, 2013, and placed under arrest.

Nora Brooks, Martin's girlfriend and the mother of his children, testified that Martin was a friend of defendant. She further testified that in July of 2013, defendant came to her and Martin's apartment for help. When she went inside her apartment, defendant was there, but Martin was not, which surprised her. Defendant told her that he needed help because U.S. Marshalls [sic] were looking for him. He asked her for a cell phone and money. Brooks agreed to help in order to protect herself and her children. Brooks and defendant went to Walmart, and Brooks went inside to get a pre-paid phone. They also went to a bank, and she withdrew approximately $300.00 from Martin's account. During this time, Martin called and asked Brooks to come home, so she did. Defendant asked her to drop him off a couple of blocks from her apartment complex, and she complied.

When Brooks got home, there were police officers and U.S. Marshalls [sic] at her apartment. She eventually told them she had been with defendant. The JPSO showed her still photographs taken from surveillance videos. Brooks positively identified defendant in two of those photographs, and she positively identified Martin in the other two photographs.

Martin testified that in July of 2012, he and defendant robbed an Advance Auto Parts store in Jefferson Parish and that defendant pulled a gun out during that

robbery.  He identified himself and defendant in the surveillance video of that robbery.  Martin remembered that he and defendant went to an Advance Auto Parts store in Jefferson Parish in order to rob it; however, they were not allowed in so they went to another Advance Auto Parts store in Jefferson Parish to rob it.  He identified himself and defendant in the surveillance video of that robbery.  Martin testified that defendant had a gun in that robbery as well.

Martin also recalled robbing two Radio Shacks in Jefferson Parish, one on Veterans next to a carwash and the other one on Clearview.  Martin further admitted that he and defendant robbed a Radio Shack in Mobile in 2013.  During that robbery, they stole cell phones.  Martin stated that he was not going to activate his phone until he knew that defendant's phone had been activated without any problems.  Defendant activated his phone and two weeks later, Martin activated his.  Martin testified that in the hours leading up to his arrest, defendant called him and said that his neighbor told him a police officer was at his house.  Martin and defendant then switched cars, and defendant decided he was going to leave town.

At some point, Martin got pulled over by the U.S. Marshalls [sic].  The police looked through his phone to see if he had any contact with defendant, but they did not see anything.  The police also tried to track Martin's car (which defendant was driving) using the OnStar system, but they were unsuccessful.  Approximately ten hours later, the police went inside Martin's apartment and talked to his girlfriend, who positively identified a photograph of Martin.  Martin was placed under arrest, advised of and waived his rights, and spoke to detectives.  Later on, Martin entered into a plea agreement wherein if he testified truthfully, the State would recommend a sentence of between twenty and twenty-five years.

The defense rested without calling any witnesses.[21]

If petitioner were now to allege that he is actually innocent of the crimes of which he stands convicted, he must support his allegations "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  Schlup v. Delo, 513 U.S. 298, 324 (1995).  "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  Id.  It certainly cannot be successful in cases such as this one, where petitioner has not presented *any* new evidence whatsoever to show that he is actually innocent.

---

[21] State v. Carter, 171 So. 3d 1265, 1269-75 (La. App. 5th Cir. 2015); State Rec., Vol. 2 of 10.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **May 13, 2019**, in order to be timely.

However, petitioner's application was filed no earlier than **May 14, 2019**.[22]  Although the application was only one day late, "the magnitude of [a petitioner's] tardiness" simply is not a proper consideration in determining the timeliness of a federal habeas application.  Lookingbill v. Cockrell, 293 F.3d 256, 264 (5th Cir. 2002).  As the United States Fifth Circuit Court of Appeals has explained:

> At the margins, all statutes of limitations and filing deadlines appear arbitrary. AEDPA relies on precise filing deadlines to trigger specific accrual and tolling provisions. Adjusting the deadlines by only a few days in both state and federal courts would make navigating AEDPA's timetable impossible. Such laxity would reduce predictability and would prevent us from treating the similarly situated equally. We consistently have denied tolling even where the petition was only a few days late.

Id. at 264-65 (footnote omitted); accord Pierre v. Cain, Civ. Action No. 15-5252, 2019 WL 3779675, at *6-7 (E.D. La. Aug. 12, 2019) (Morgan, J.).

Because petitioner's federal application was not filed until after the AEDPA's statute of limitations expired, the application was untimely.  Relief should therefore be denied on that basis.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Ervin Carter be **DISMISSED WITH PREJUDICE**.

---

[22] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner has declared under penalty of perjury that his application was placed in the prison mailing system on May 14, 2019.  Rec. Doc. 8, p. 18.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___29th___ day of September, 2020.


**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**